SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Viking Global Equities LP, Viking Global Equities II LP, and VGE III Portfolio Ltd.,

                    Plaintiffs,

       v.

Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG,

                    Defendant.

: Index No. 650435/2011
: (Oral Argument Requested)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Glenhill Capital LP; Glenhill Capital Overseas Master Fund LP; Glenhill Concentrated Fund LP; Glenview Capital Partners, L.P.; Glenview Institutional Partners, L.P.; Glenview Capital Master Fund, Ltd.; GCM Little Arbor Partners, L.P.; GCM Little Arbor Institutional Partners, L.P.; GCM Little Arbor Master Fund, Ltd.; GCM Opportunity Fund, L.P.; Glenview Capital Opportunity Fund, L.P.; Glenview Offshore Opportunity Master Fund, Ltd.; Greenlight Capital, L.P.; Greenlight Capital Qualified, L.P.; Greenlight Capital Offshore Partners; Greenlight Reinsurance, Ltd.; Royal Capital Value Fund, LP; Royal Capital Value Fund (QP), LP; RoyalCap Value Fund, Ltd.; RoyalCap Value Fund II, Ltd.; Tiger Global, L.P.; Tiger Global II, L.P.; Tiger Global, Ltd.,

                    Plaintiffs,

       v.

Porsche Automobil Holding SE, f/k/a Dr. Ing. h.c. F. Porsche AG,

                    Defendant.

: Index No. 650678/2011
: Honorable Charles E. Ramos
: Commercial Division
: Part 53
: (Oral Argument Requested)

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANT PORSCHE AUTOMOBIL HOLDING SE'S MOTION TO DISMISS

Robert J. Giuffra, Jr.
John L. Warden
Suhana S. Han
Alexander J. Willscher
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

June 29, 2011

*Counsel for Porsche Automobil Holding SE*

# TABLE OF CONTENTS

*Page*

**PRELIMINARY STATEMENT** ..................................................................................1

**BACKGROUND** .......................................................................................................5

    A.    The Parties ................................................................................................5

    B.    VW ...............................................................................................................5

    C.    Porsche's Acquisition of a Stake in VW...............................................6

    D.    Porsche Decides To Pursue a Majority Position in VW and Subsequently
           Announces Its Decision To Aim To Increase Its Stake to 75% in 2009.................7

    E.    Related German Proceedings ..................................................................8

    F.    Plaintiffs' Claims and Alleged Transactions .........................................9

    G.    Plaintiffs' Pending Federal Lawsuits ...................................................10

**ARGUMENT** .........................................................................................................11

**I.    THIS COURT SHOULD DISMISS THE COMPLAINTS UNDER THE
    DOCTRINE OF FORUM NON CONVENIENS** ..........................................11

    A.    Plaintiffs' Dispute with Porsche Has an Insufficient Nexus with New York
           To Justify Burdening This New York Court..........................................12

    B.    Germany's Significant Interest in These Matters Dictates That Plaintiffs'
           Claims Should Be Adjudicated There....................................................14

    C.    Germany Is an Adequate Alternative Forum. .......................................16

    D.    Resolution of Plaintiffs' Claims Requires Application of German Law. .............17

    E.    This Court's Judgment Would Be Unenforceable in Germany. ...........18

    F.    The Relevant Witnesses and Documents Are Located in Germany. .....................19

    G.    Plaintiffs' New York Places of Business Are Not Dispositive............................20

**II.     AS A MATTER OF LAW, PLAINTIFFS' COMMON LAW FRAUD AND UNJUST ENRICHMENT CLAIMS DO NOT STATE A CAUSE OF ACTION** ........................................................................................................20

     A.     Porsche's Challenged Statements Were True at the Time They Were Made and Porsche Reasonably Believed Them To Be True at That Time .....................21

     B.     The Two Sources Cited To Support Plaintiffs' Misstatement Claims Do Not Suffice for That Purpose, and the Attack on Porsche's Options Disclosure Fails As Well ........................................................................................24

     C.     Plaintiffs' Unjust Enrichment Claims Fail To State a Cause of Action ................27

**III.     IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS OR STAY THE COMPLAINTS IN LIGHT OF THE PENDING FEDERAL ACTION THAT INVOLVES SUBSTANTIALLY THE SAME PARTIES, CLAIMS, AND RELIEF SOUGHT.** ..............................................................................................28

**CONCLUSION** ........................................................................................................32

## TABLE OF AUTHORITIES

**CASES**                                                         *Page(s)*

*1199 Hous. Corp.* v. *Int'l Fidelity Ins. Co.*,
  14 A.D.3d 383 (1st Dep't 2005) ..........................................................21

*Adriana Dev. Corp. N.V.* v. *Gaspar*,
  81 A.D.2d 235 (1st Dep't 1981) ..........................................................16

*Asher* v. *Abbott Labs.*,
  307 A.D.2d 211 (1st Dep't 2003) ........................................................31

*Babcock* v. *Jackson*,
  12 N.Y.2d 473 (1963) .........................................................................17

*Bangkok Crafts Corp.* v. *Capitolo Di San Pietro in Vaticano*,
  331 F. Supp. 2d 247 (S.D.N.Y. 2004) .................................................28

*Blueye Navigation, Inc.* v. *Den Norske Bank*,
  239 A.D.2d 192 (1st Dep't 1997) ........................................................20

*Brinson* v. *Chrysler Fin.*,
  43 A.D.3d 846 (2d Dep't 2007) .............................................................5

*Burrowes* v. *Combs*,
  No. 104225/2011, 2005 WL 5643840 (Sup. Ct. New York Co. Feb. 18, 2005) ....................31

*Certain Underwriters at Lloyd's* v. *Pneumo Abex Corp.*,
  No. 602493/2002, 2005 WL 5960116 (Sup. Ct. New York Co. July 29, 2005).....................30

*Chase Manhattan Bank* v. *N.H. Ins. Co.*,
  193 Misc.2d 580, 749 N.Y.S.2d 632 (Sup. Ct. New York Co. May 23, 2002) .......................17

*Cherico, Cherico & Assocs.* v. *Midollo*,
  67 A.D.3d 622 (2d Dep't 2009) ..........................................................29

*Citigroup Global Mkts., Inc.* v. *Metals Holding Corp.*,
  12 Misc.3d 1168A, 2006 WL 1594442 (Sup. Ct. New York Co. June 8, 2006)..............17, 20

*Colon* v. *Gold*,
  166 A.D.2d 406 (2d Dep't 1990) ..........................................................29

*CompuDyne Corp.* v. *Shane*,
  453 F. Supp. 2d 807 (S.D.N.Y. 2006)...................................................28

*Edelman* v. *Starwood Capital Group, LLC*,
    70 A.D.3d 246 (1st Dep't 2009) ............................................................................27

*Elliott Assocs.* v. *Porsche Automobil Holding SE*,
    759 F. Supp. 2d 469 (S.D.N.Y. 2010) ........................................................... *passim*

*Elliott Assocs., L.P.* v. *Covance, Inc.*,
    No. 00-cv-4115, 2000 WL 1752848 (S.D.N.Y. Nov. 28, 2000) ..............................24

*ESBE Holdings, Inc.* v. *Vanquish Acquisition Partners, LLC*,
    50 A.D.3d 397 (1st Dep't 2008) ............................................................................21

*Ferber* v. *Travelers Corp.*,
    785 F. Supp. 1101 (D. Conn. 1991) .......................................................................26

*Fin. & Trading Ltd.* v. *Rhodia S.A.*,
    28 A.D.3d 346 (1st Dep't 2006) ...........................................................14, 16, 18, 19

*Globalvest Mgmt. Co.* v. *Citibank, N.A.*,
    7 Misc.3d 1023A, 2005 WL 1148687 (Sup. Ct. New York Co. May 12, 2005) ............ *passim*

*Gulf Oil Corp.* v. *Gilbert*,
    330 U.S. 501 (1947) ........................................................................................18, 21

*Herman* v. *Greenberg*,
    221 A.D.2d 251 (1st Dep't 1995) ...........................................................................21

*Hernandez* v. *Cali, Inc.*,
    32 A.D.2d 192 (1st Dep't 1969) .......................................................................12, 18

*IDT* v. *Morgan Stanley Dean Witter & Co.*,
    12 N.Y.3d 132 (2009) ...........................................................................................27

*Imaging Holdings I, LP* v. *Isr. Aerospace Indus. Ltd.*
    26 Misc.3d 1226A, 2009 WL 5895337 (Sup. Ct. New York Co. Dec. 11, 2009) ..................15

*In re Alcon S'holder Litig.*,
    719 F. Supp. 2d 263 (S.D.N.Y. 2010) ....................................................................18

*In re MSC Indus. Direct Co. Sec. Litig.*,
    283 F. Supp. 2d 838 (E.D.N.Y. 2003) ....................................................................25

*In re Optionable Sec. Litig.*,
    577 F. Supp. 2d 681 (S.D.N.Y. 2008) ...............................................................24, 25

*In re Time Warner Inc. Sec. Litig.*,
    9 F.3d 259 (2d Cir. 1993) ......................................................................................26

*In re Topps Co. S'holder Litig.*,
　19 Misc.3d 1103A, 2007 WL 5018882 (Sup. Ct. New York Co. June 8, 2007) .............. 28-29

*Islamic Rep. of Iran* v. *Pahlavi*,
　62 N.Y.2d 474 (1984) ........................................................................................12, 17, 18

*Krisel* v. *Phillips Petroleum Co.*,
　32 A.D.2d 628 (1st Dep't 1969) ....................................................................................29

*Mandarin Trading Ltd.* v. *Wildenstein*,
　16 N.Y.3d 173 (2011) ....................................................................................................27

*Morrison* v. *Nat'l Australia Bank*,
　130 S. Ct. 2869 (2010) ..................................................................................................10

*Naturopathic Labs. Int'l, Inc.* v. *SSL Americas, Inc.*,
　18 A.D.3d 404 (1st Dep't 2005) ....................................................................................21

*Neuter, Ltd.* v. *Citibank, N.A.*,
　239 A.D.2d 213 (1st Dep't 1997) ..................................................................................17

*Nicholson* v. *Pfizer, Inc.*,
　278 A.D.2d 143 (1st Dep't 2000) ..................................................................................19

*Novak* v. *Kasaks*,
　216 F.3d 300 (2d Cir. 2000).....................................................................................25, 26

*OSRecovery, Inc.* v. *One Groupe Int'l, Inc.*,
　354 F. Supp. 2d 357 (S.D.N.Y. 2005)............................................................................27

*Phat Tan Nguyen* v. *Banque Indosuez*,
　19 A.D.3d 292 (1st Dep't 2005) ....................................................................................17

*Proietto* v. *Donohue*,
　189 A.D.2d 807 (2d Dep't 1993) ..................................................................................30

*Roberts* v. *Pollack*,
　92 A.D.2d 440 (1st Dep't 1983) ....................................................................................21

*San Diego Country Employees Ret. Ass'n.* v. *Maounis*,
　749 F. Supp. 2d 104 (S.D.N.Y. 2010).......................................................................17-18

*Shin-Etsu Chem. Co.* v. *3033 ICICI Bank Ltd.*,
　9 A.D.3d 171 (1st Dep't 2004) .......................................................................... *passim*

*Sperry* v. *Crompton Corp.*,
　8 N.Y.3d 204 (2007) ......................................................................................................27

*Tilleke & Gibbins Int'l, Ltd.* v. *Baker & McKenzie*,
302 A.D.2d 328 (1st Dep't 2003) ........................................................17

*Triple Z Postal Servs., Inc.* v. *United Parcel Serv., Inc.*,
13 Misc. 3d 1241, 2006 WL 3393259 (Sup. Ct. New York Co. Nov. 24, 2006) ...................27

*TVT Records* v. *Island Def Jam Music Grp.*,
412 F.3d 82 (2d Cir. 2005)..................................................................27

*Wachovia Sec., LLC* v. *Joseph*,
14 Misc.3d 1228A, 2007 WL 419366 (Sup. Ct. New York Co. Feb. 7, 2007) .................4, 28

*White Light Prods., Inc.* v. *On The Scene Prods., Inc.*,
231 A.D.2d 90 (1st Dep't 1997) .......................................................5, 29

*World Point Trading PTE* v. *Credito Italiano*,
225 A.D.2d 153 (1st Dep't 1996) ......................................................5, 17

*Wyser-Pratte Mgmt. Co.* v. *Babcock Borsig AG*,
7 Misc.3d 1012A, 2004 WL 3312835 (Sup. Ct. New York Co. July 8, 2004)............... *passim*

STATUTES

CPLR 327....................................................................................1, 11, 20

CPLR 2201........................................................................................31

CPLR 3211...................................................................................... *passim*

Section 10(b) of the U.S. Securities Exchange Act of 1934,
15 U.S.C. § 78j(b) (2011) ................................................................2, 10

OTHER AUTHORITIES

60A N.Y. Jur. 2d Fraud and Deceit § 123 ..............................................21

60A N.Y. Jur. 2d Fraud and Deceit § 124 ..............................................21

1 N.Y. Jur. 2d Actions § 29 ..................................................................31

Restatement (Third) of Foreign Relations Law § 403(3) (1987)..................16

Porsche Automobil Holding SE ("Porsche") submits this memorandum in support of its motion to dismiss Viking Global Equities LP, et al.'s ("*Viking*") Complaint ("VC"), and Glenhill Capital LP, et al.'s ("*Glenhill*") Complaint ("GC") (collectively, the "Complaints"), pursuant to the doctrine of forum non conveniens (codified in CPLR 327), CPLR 3211(a)(7), and alternatively, CPLR 3211(a)(4).

## PRELIMINARY STATEMENT

These cases do not belong in New York state court.  The Complaints challenge disclosures made in Germany by Porsche, a German company, about its accumulation of shares of another German company traded in Germany.  German statutory and regulatory requirements are central to the disposition of these cases.  Plaintiffs, who voluntarily speculated in the price of German securities, should not be permitted to burden this Court with lawsuits that should be heard in Germany.

Plaintiffs—an international collection of sophisticated hedge funds—gambled on the price of securities traded on a foreign exchange and lost.  By establishing short positions through short sales and private swap agreements on the ordinary shares of Volkswagen AG ("VW") from March 4, 2008 through October 31, 2008 (the "Relevant Period"), Plaintiffs bet that the price of VW ordinary shares ("VW Shares") would decline.  (GC ¶¶ 4-5, 73; VC ¶¶ 23-24, 39.)  But when the price of VW Shares instead "shot upwards," Plaintiffs allege that they were forced to cover their short positions at artificially high prices, and now seek to recover their alleged losses because their "short investment thesis prove[d] incorrect."  (GC ¶ 6; VC ¶ 21.)

Plaintiffs claim that, in connection with Porsche's aim to acquire a 75% stake in VW, economic conditions permitting, Porsche "lured" Plaintiffs "into a trap" by misrepresenting its intention to take over VW.  (GC ¶¶ 5, 11; VC ¶¶ 26, 30.)  Porsche's alleged conduct—which occurred outside the United States—purportedly caused a "short squeeze" on German stock

markets after Porsche announced, in an October 26, 2008 press release, the extent of its holdings in VW.

Plaintiffs bring the instant actions before this Court because Judge Harold Baer, Jr. dismissed their original claims under the federal securities laws in the United States District Court for the Southern District of New York (the "Federal Action").  Plaintiffs' previously-filed complaints against Porsche in the Federal Action alleged substantially similar facts and legal claims and sought substantially the same relief.  On December 30, 2010, Judge Baer dismissed Plaintiffs' securities fraud claims on the basis that Section 10(b) of the U.S. Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) (2011), does not cover claims against "foreign issuers with little relationship to the U.S. . . . simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stock."  *Elliott Assocs.* v. *Porsche Automobil Holding SE*, 759 F. Supp. 2d 469, 476 (S.D.N.Y. 2010).  Judge Baer also declined to exercise supplemental jurisdiction over Plaintiffs' common law fraud claims, citing the "strong connection of all aspects of this action to Germany."  *Id.* at 477.

Plaintiffs' claims before this Court also should be dismissed.  *First*, these cases are the quintessential candidate for dismissal on the basis of forum non conveniens.  As Judge Baer found, all aspects of these cases are overwhelmingly connected to Germany.  New York courts, including this one, have repeatedly found Germany to be an adequate forum.  *Wyser-Pratte Mgmt. Co.* v. *Babcock Borsig AG*, 7 Misc.3d 1012A, 2004 WL 3312835, at *6 (Sup. Ct. New York Co. July 8, 2004) (Ramos, J.), *aff'd*, 23 A.D.3d 269 (1st Dep't 2005).  Indeed, the facts presented here are essentially identical to those presented in *Wyser-Pratte*, where this Court dismissed a New York-based investment management fund's fraud claims against a German company, because the cause of action arose "nearly entirely from transactions and events that took place out of New York and mainly in Germany."  *Id.* at *5.

While these cases lack a substantial nexus with New York, "Germany has a significant interest in adjudicating this action given the substantial nexus with that country." *Id.* In a letter dated June 21, 2011 from the Consulate General of the Federal Republic of Germany ("German Government Letter"), attached as Exhibit 1 hereto, the German Government has requested that this Court dismiss these actions on the basis of forum non conveniens. This letter emphasizes Germany's "strong interest in the conduct of German businesses and trade in German securities being controlled by the German courts," and notes that German law enforcement officials are investigating allegations similar to those of the Complaints.

Moreover, trying these actions in this forum will significantly burden this Court and the parties. As Judge Baer stated, "the merits of Plaintiffs' common law fraud claims would require the Court to analyze German law governing securities fraud . . . ." *Elliott Assocs*., 759 F. Supp. 2d at 477. In fact, several investors already have initiated, or taken steps to initiate, proceedings in Germany against Porsche, thereby raising the risk of inconsistent results if these cases were to proceed. Many of the key witnesses in these actions—including the two former Porsche executives whom Plaintiffs claim were the "masterminds" of the alleged scheme—live in Germany, beyond the reach of this Court's subpoena power. Most of the relevant documents "were drafted in Germany, are written in German and will require extensive translation." *Wyser-Pratte*, 2004 WL 3312835, at *5. Finally, even if these cases were tried in a New York forum, as Judge Baer recognized, a U.S. judgment against Porsche would not be enforceable in Germany because Germany provides for exclusive jurisdiction of securities fraud cases in its own courts. *Elliott Assocs.*, 759 F. Supp. 2d at 477. Taken together, all relevant factors unquestionably favor Germany as the appropriate forum and warrant dismissal of these actions.

*Second*, while the Court need not reach this point, Plaintiffs have failed to meet the pleading requirements of common law fraud and unjust enrichment. For example, Plaintiffs

contend that by announcing that Porsche intended to increase its stake in VW Shares "to over 50%," Porsche was telling reasonable investors it intended to go to "slightly more than [] 50%," but no higher.  (*See, e.g.*, GC ¶¶ 96-97; VC ¶ 26(a).)  But Porsche expressly disclosed that it did not want to foreclose the possibility that it would seek a controlling stake in VW.  In fact, market analysts understood, as early as 2007 and over a year before Porsche allegedly "sprung the trap" (GC ¶ 6), that Porsche might engage in a takeover of VW.  In short, any reasonable investor, especially those as sophisticated as Plaintiffs, would have recognized that Porsche might seek a 75% stake in VW if circumstances allowed.

Likewise, the alleged connection between Porsche's enrichment and Plaintiffs' loss is too attenuated to state a claim for unjust enrichment as a matter of law.  *See Wachovia Sec., LLC* v. *Joseph*, 14 Misc.3d 1228A, 2007 WL 419366, at *4 (Sup. Ct. New York Co. Feb. 7, 2007), *aff'd*, 56 A.D.3d 269 (1st Dep't 2008).  Plaintiffs do not allege that Porsche traded with or received any direct benefit from them.  Although Plaintiffs allege that they sold VW Shares short (and in some instances, engaged in short-equivalent swap agreements), they do not allege that they borrowed any shares from Porsche directly or later purchased shares from Porsche in order to cover their short positions.  Without more, Plaintiffs' claims for unjust enrichment must fail.

*Finally*, in the alternative, the Court should dismiss or stay the Complaints pursuant to CPLR 3211(a)(4), because Plaintiffs are simultaneously pursuing an appeal to the Second Circuit of their parallel Federal Action.  There is substantial overlap of identities between the Plaintiffs in these actions and the Federal Action, and the complaints in both allege substantially similar facts and legal claims and seek substantially the same relief.  Proceeding with these cases while the Federal Action remains pending presents the risk that conflicting rulings might be issued by courts of two jurisdictions and would involve duplication of efforts in litigating substantially identical cases in two different forums.  In the interests of comity and

-4-

preservation of judicial resources, this Court should dismiss or stay the Complaints pending resolution of the Federal Action. *See White Light Prods., Inc.* v. *On The Scene Prods., Inc.*, 231 A.D.2d 90, 96 (1st Dep't 1997).

## BACKGROUND

### A.    The Parties

Plaintiffs in the *Glenhill* action are 23 global hedge funds, all organized outside New York, and nine organized under the laws of the Cayman Islands and the British Virgin Islands. (GC ¶¶ 33-60.) Plaintiffs in the *Viking* action are three hedge funds, all organized outside New York, and one organized under the laws of the Cayman Islands. (VC ¶ 1.)

Headquartered in Stuttgart, Germany, Porsche is organized under and subject to the laws of the European Union ("EU") and Germany. (GC ¶ 61; VC ¶ 4; Declaration of Peter O. Mülbert, dated June 24, 2011 ("Mülbert Decl.") ¶¶ 13-15.[1]) Although Porsche is a public company, with its non-voting preference shares publicly traded in Germany, all of its ordinary voting shares during the Relevant Period were owned by members of the Porsche and Piëch families, the descendants of the company founder. (Exs. 4, 5 at 27.)[2]

### B.    VW

VW is a German corporation, headquartered in Wolfsburg, Germany. (VC ¶ 38.) During the Relevant Period, the German State of Lower Saxony owned slightly more than 20% of VW Shares. (GC ¶ 8.) VW Shares are not traded on any U.S. stock exchange, and its ADRs

---

[1]      In deciding a motion to dismiss for forum non conveniens pursuant to CPLR 327(a), the Court may consider extrinsic material submitted in support of the motion. *See, e.g., Brinson* v. *Chrysler Fin.*, 43 A.D.3d 846, 847 (2d Dep't 2007) (reversing denial of motion to dismiss for forum non conveniens and relying on witness affidavits establishing that trial in New York would "constitute a hardship in terms of time, expense, and inconvenience"); *World Point Trading PTE* v. *Credito Italiano*, 225 A.D.2d 153, 161 (1st Dep't 1996) (reversing denial of motion to dismiss for forum non conveniens and relying on affidavit to establish that relevant witnesses and documents were located in Italy).

[2]      All references to "Ex." are to the exhibits accompanying the Affirmation of Robert J. Giuffra, Jr., dated June 29, 2011 ("Giuffra Aff.").

are traded over-the-counter in the United States but not on any U.S. stock exchange.  (GC ¶ 73 &

n.5; VC ¶ 39.)  VW has always played a significant role in Porsche's business.  Due to Porsche's

limited size and manufacturing capability, it depends upon VW for components and technical

support to control costs.  (Ex. 6 at 4; GC ¶¶ 74, 84; VC ¶ 40.)  The "technical and strategic

collaboration between Porsche and Volkswagen" has produced "benefits for both partners"

(Ex. 7), and by 2005, Porsche's collaborative projects with VW accounted for more than one-

third of Porsche's sales volume.  (Ex. 6 at 4.)

Under the VW Act, a German law enacted in 1960 to shield VW from a hostile

takeover (Ex. 8), any holder of VW Shares was limited to 20% of the voting power, and approval

by holders of 80% of VW Shares (instead of the typical 75% threshold under German law) was

required to impose a "domination and profit-transfer" agreement.[3]  (GC ¶ 9; VC ¶¶ 40, 45.)  The

VW Act effectively prevented VW from being the target of a takeover attempt, because the State

of Lower Saxony held minority blocking power.  In 2004, the European Commission ("EC")

requested that Germany amend the VW Act on the ground that it violated EU law.  (Ex. 10.)  If

the VW Act were invalidated, Porsche's most vital business partner would become a potential

takeover target.  (Ex. 11.)  Porsche, therefore, decided to acquire a shareholding in VW and

protect its basic industrial logic and cooperative relationship with VW.  (GC ¶¶ 74, 84; VC ¶ 40.)

**C.    Porsche's Acquisition of a Stake in VW**

Between 2005 and 2008, Porsche continually increased its stake in VW in

response to various factors, including the status of the VW Act, the support of the Porsche and

Piëch families, and general economic conditions.  (Exs. 7, 11, 14; GC ¶¶ 73-74, 83-84; VC

¶¶ 40-41.)  In 2005, Porsche began acquiring VW Shares "to secure [its] business relations with"

---

[3]      A domination agreement allows the acquiring firm to control the target firm's decisions.  (GC ¶ 9; VC
¶ 45.)  A profit-transfer agreement requires the target firm to transfer its profits (and any losses) to the acquiring
firm, facilitating the financing of takeover costs.  (Ex. 9 at 134.)

VW (Ex. 11), initially acquiring a 10.26% stake in September 2005, then publicly announcing its shareholdings as its position in VW Shares grew to 42.6% by October 2008.  (Exs. 12-14; GC ¶¶ 74, 75, 79, 80, 84; VC ¶ 41.)

In addition to purchasing VW Shares, Porsche bought cash-settled options relating to VW Shares.  These options did not entitle Porsche to purchase VW Shares but protected Porsche against increasing prices of VW Shares, if Porsche later decided to purchase such shares, by providing Porsche with cash equal to the difference between the strike price and a higher market price.  (Exs. 14, 15 at 3.)  Plaintiffs allege that Porsche "concealed its plan" to acquire a 75% stake through these options.  (GC ¶ 12; VC ¶ 46.)  In fact, even though—as Plaintiffs concede—German law did not require disclosure of cash-settled options (GC ¶ 12; Mülbert Decl. ¶¶ 29-30), Porsche had disclosed that it held such options relating to VW Shares and continued to do so during the Relevant Period, including disclosing that it had "secured cash-settled stock options which provide for settlement in cash and not share subscriptions" on March 4, 2008.  (Exs. 15 at 3, 16 at 167, 17 at 2.)

**D.**    **Porsche Decides To Pursue a Majority Position in VW and Subsequently Announces Its Decision To Aim To Increase Its Stake to 75% in 2009.**

On March 3, 2008, Porsche decided and announced its intention to acquire "more than 50%" of the shares in VW.  (VC ¶ 26(a).)  On March 10, 2008, in responding to media speculation and referring to the March 3, 2008 decision, Porsche denied any plans to acquire 75% of VW, noting that Lower Saxony's 20% VW ownership made "the probability" of acquiring 75% "very small indeed."  (GC ¶ 89; VC ¶ 48(c); Ex. 18.)  After widespread reports of opposition to Porsche's takeover attempt by Prof. Ferdinand K. Piëch ("Prof. Piëch"), chairman of VW's Supervisory Board and member of Porsche's Supervisory Board (Exs. 19, 20;

VC ¶ 50), Porsche publicly announced on October 24, 2008 that its controlling families, including Prof. Piëch, supported its acquisition of VW.  (Ex. 21.)

On October 26, 2008, Porsche announced that, due to distortions in the market, it had decided to disclose its holdings of 42.6% of VW Shares and "31.5 percent in so called cash settled options relating to" VW Shares "to hedge against price risks, representing a total of 74.1 percent." (Ex. 14; GC ¶ 29; VC ¶ 70.)  Porsche made clear that the options would be settled "in cash" with Porsche receiving "the difference between the then actual Volkswagen share price and the underlying strike price in cash."  (Ex. 14; GC ¶ 29; VC ¶ 70.)  Porsche stated it would increase its position to above 50% "in November/December 2008," and had decided to aim to increase its VW stake "to 75% in 2009, paving the way to a domination agreement," economic conditions permitting.  (GC ¶ 29; VC ¶ 70; Ex. 14.)

### E.  Related German Proceedings

Following Porsche's October 26, 2008 announcement, Germany's Federal Financial Supervisory Authority (the "BaFin"), whose role is similar to that of the U.S. Securities and Exchange Commission, began an "investigation into VW's share-price movements for signs of market manipulation" by Porsche.  (Ex. 22.)  At the end of March 2009, BaFin concluded that it had found no wrongdoing by Porsche, but in May 2009, BaFin launched a second investigation.  (Ex. 23.)  The Stuttgart Public Prosecutor is leading a related investigation into whether Porsche's former executives manipulated the German markets by failing to disclose information related to Porsche's shareholding in VW, or breached their fiduciary duties in connection with Porsche's acquisition of VW Shares.  (Exs. 24, 25.)  Moreover, a private investor filed a complaint in German court resting on allegations similar to those alleged in the Complaints.  (Declaration of Gerhard Wagner, dated June 28, 2011 ("Wagner Decl.") ¶¶ 12, 16.)  And private parties from various countries have taken steps to

commence civil law-based "conciliatory proceedings" (*i.e.*, mediation anticipating litigation) in Germany against Porsche by disclosing their intent to claim damages based on allegations of market manipulation and misstatements similar to those alleged in the Complaints. (*Id.* ¶ 16.)

> **F.      Plaintiffs' Claims and Alleged Transactions**

The *Glenhill* Plaintiffs concede that all 11 of Porsche's alleged misstatements on which they base their common law fraud claim were made by Porsche in Germany (GC ¶¶ 89, 93, 96, 99, 102, 105, 113, 116, 120, 123) or, in one instance, in France (*Id.* ¶ 109).  The *Viking* Plaintiffs base their claims on 10 of the same alleged misstatements plus five additional statements, none of which they allege Porsche made in the United States. (VC ¶¶ 26, 28, 48.) These alleged misstatements include phone calls with Porsche's Investor Relations representative—one phone call with the *Viking* Plaintiffs (VC ¶ 28) and five phone calls with various *Glenhill* Plaintiffs (GC ¶¶ 93, 102, 116, 120, 123).

As Plaintiffs concede, the Porsche representative was in Germany during these alleged phone calls, and there is no allegation that this representative initiated the calls. Moreover, although Plaintiffs allege that certain of the statements were emailed to them in the United States, nowhere do Plaintiffs allege that Porsche's Investor Relations specifically targeted them or New York recipients—as opposed to sending emails to a distribution list consisting of recipients both within and outside the United States.  All of the alleged Porsche misstatements are subject to EU and German securities law. (Mülbert Decl. ¶¶ 24-25, 31-33; Wagner Decl. ¶¶ 14-17.)   In addition, Plaintiffs allege that Porsche "manipulat[ed] the market in VW shares," which trade only on foreign exchanges (GC ¶¶ 12, 73; VC ¶¶ 39, 60).

According to Plaintiffs, Porsche "induced Plaintiffs to take short positions" in VW Shares through direct short sales and security-based swap agreements. (GC ¶¶ 17, 88.) Through short sales, Plaintiffs "will borrow the necessary securities from other owners and

deliver those shares to a purchaser of those shares, with . . . the obligation to replace the borrowed securities at a later date."  (VC ¶ 19; GC ¶ 3.)  A "security-based swap agreement" is a contract the material terms of which are subject to individual negotiation, and which provides for the exchange of one or more payments based on the price of one or more securities.  (GC ¶ 3.)  Under such agreements, some *Glenhill* Plaintiffs were entitled to receive payments when the price of VW Shares decreased, and were required to make payments when the price of VW Shares increased, achieving an economic result similar to a short sale.  (GC ¶ 4.)

## G.    Plaintiffs' Pending Federal Lawsuits

Prior to filing the Complaints in this Court, Plaintiffs sued Porsche[4] in the Federal Action,[5] alleging violations of Section 10(b) of the Exchange Act and common law fraud.  The *Viking* Plaintiffs also asserted an unjust enrichment claim.

On December 30, 2010, Judge Baer dismissed Plaintiffs' claims, holding that under the Supreme Court's decision in *Morrison* v. *National Australia Bank*, 130 S. Ct. 2869 (2010), Section 10(b) does not apply to security-based swap agreements referencing shares traded on foreign exchanges.  *Elliott Assocs.*, 759 F. Supp. 2d at 476.  In holding that such agreements did not constitute "domestic transactions" under *Morrison*, Judge Baer reasoned that this outcome was consistent with the Supreme Court's intention to curtail the extraterritorial application of Section 10(b) in order "to avoid interference with foreign securities regulation that application of § 10(b) abroad would produce."  *Id*. at 474.  Recognizing that the Exchange Act was not intended to regulate foreign securities exchanges, Judge Baer refused to adopt "a rule that would make foreign issuers with little relationship to the United States subject to suits here

---

[4]       In addition, the *Glenhill* Plaintiffs sued Porsche's former Chief Executive Officer, Dr. Wendelin Wiedeking, and former Chief Financial Officer, Mr. Holger P. Haerter, in the Federal Action.

[5]       The actions are *Elliott Assocs. et al.* v. *Porsche Automobil Holding SE et al.*, No. 10 Civ. 0532; *Viking Global Equities LP et al.* v. *Porsche Automobil Holdings SE*, No. 10 Civ. 8073.

simply because a private party in this country entered into a derivatives contract that references the foreign issuer's stock." *Id.* at 476.

Judge Baer also declined to exercise supplemental jurisdiction over Plaintiffs' common law fraud claims, emphasizing the "strong connection of all aspects of this action to Germany," including the fact that both the issuer of the relevant securities, VW, and Porsche are located in Germany. *Id.* at 477. Judge Baer also cited to a letter he received from the German Government discussing the regulation of Germany's securities markets and its strong interest in having issues regarding those markets settled in its own courts. *Id.* at 477.

On January 28, 2011, nine of the 23 *Glenhill* Plaintiffs filed a notice of appeal in the Federal Action. On January 31, 2011, the three *Viking* Plaintiffs filed a notice of appeal. These appeals were consolidated in the Second Circuit and will be fully briefed in August 2011. *Viking Global Equities LP, et al.* v. *Porsche Automobil Holdings SE, et al.*, 11-0397-cv(L).

## ARGUMENT

## I.  THIS COURT SHOULD DISMISS THE COMPLAINTS UNDER THE DOCTRINE OF FORUM NON CONVENIENS.

Because of the overwhelming connections of these actions to Germany, this Court should exercise its "sound discretion" to dismiss the Complaints in their entirety under the doctrine of forum non conveniens. *See Shin-Etsu Chem. Co.* v. *3033 ICICI Bank Ltd.*, 9 A.D.3d 171, 175 (1st Dep't 2004). It is hard to imagine cases more appropriate than these for such disposition: the Complaints concern disclosures made in Germany by a German company about its accumulation of shares of another German company traded in Germany, and the alleged manipulation of German securities in German markets.

The doctrine of forum non conveniens, codified in CPLR 327, "permits a court to stay or dismiss [an action] where it is determined that the action, although jurisdictionally sound,

would be better adjudicated elsewhere." *Islamic Rep. of Iran* v. *Pahlavi*, 62 N.Y.2d 474, 478-79 (1984).  "The burden rests upon the defendant challenging the forum to demonstrate relevant private or public interest factors which militate against accepting the litigation." *Id.* at 479.

"Among the factors to be considered are the burden on the New York courts, the potential hardship to the defendant, and the unavailability of an alternative forum in which plaintiff may bring suit.  The court may also consider that both parties to the action are nonresidents and that the transaction out of which the cause of action arose occurred primarily in a foreign jurisdiction.  No one factor is controlling." *Id.* (citations omitted).  New York courts also consider (i) the alternate forum's sovereign interest in the case, *see, e.g., Shin-Etsu*, 9 A.D.3d at 178; (ii) the likelihood that foreign law will apply, *id.*; and (iii) the likelihood that a New York court's judgment will be unenforceable against the defendant, *see, e.g., Hernandez* v. *Cali, Inc.*, 32 A.D.2d 192, 195 (1st Dep't 1969).  Here, the balancing of these factors makes clear that Germany is the proper forum to resolve Plaintiffs' dispute with Porsche.

### A. Plaintiffs' Dispute with Porsche Has an Insufficient Nexus with New York To Justify Burdening This New York Court.

"New York courts have regularly dismissed actions on the grounds that they have an insufficient nexus with New York and would thus place an undue burden on the courts by adjudicating them here." *Wyser-Pratte*, 2004 WL 3312835, at *4.  This is so because New York courts, which are among the busiest in the country, "should not be under any compulsion to add to their heavy burden by accepting jurisdiction of a cause of action having no substantial nexus with New York." *Id.* at *6 (citation omitted).  Courts therefore routinely dismiss actions where, as here, "the transaction[s] out of which the cause of action arose occurred primarily in a foreign jurisdiction." *Globalvest Mgmt. Co.* v. *Citibank, N.A.*, 7 Misc.3d 1023A, 2005 WL 1148687, at *4 (Sup. Ct. New York Co. May 12, 2005).

The allegations here are almost identical to those in *Wyser-Pratte*, where this Court dismissed a New York-based investment management fund's fraud claims against a German company, because the cause of action "d[id] not have a substantial nexus with New York" and "ar[o]se nearly entirely from transactions and events that took place outside of New York and mainly in Germany." *Wyser-Pratte*, 2004 WL 3312835, at *5. Relying on factors also present here, this Court stated that (i) the defendant "is a German company which is traded solely on German stock exchanges," (ii) the "vast majority of misrepresentations complained of by plaintiff took place in Germany," (iii) "most of the documents at issue here were drafted in Germany, are written in German and will require extensive translation," and (iv) "most of the potential witnesses identified by the parties are residents of Germany." This Court also stated that "many, and probably most, of the transactions and accounting procedures at issue here will be governed by German law and accounting rules," and that "a German court is more familiar with such law and thus better equipped to apply that law." *Id.* (citations omitted). Rejecting plaintiff's contention that the action had a substantial New York nexus because certain alleged misstatements were made at a meeting in New York City, this Court found that "this single meeting is the only event . . . that connects this action to New York," and "is insufficient to establish a sufficient New York nexus, particularly when compared to the overwhelming nexus with Germany." *Id.*

Similarly, in these cases, "the action is almost entirely concerned with the events, institution[s] and laws of a foreign nation . . . ." *Globalvest*, 2005 WL 1148687, at *3. Plaintiffs chose to speculate in VW Shares—securities of a German company that trade exclusively on foreign exchanges. All the alleged misstatements, including financial reports, press releases, and newspaper articles, were made outside the United States, almost entirely in Germany. Porsche's disclosure obligations are governed by German and EU law. Most of the relevant documents

were drafted in Germany and are written in German, and most of the relevant witnesses are located in Germany as well.

No New York nexus arises from Plaintiffs' alleged receipt of emailed copies of public statements issued in Germany and disseminated globally. Likewise, while certain Plaintiffs allege that, while they were in New York, they spoke on the phone with a Porsche representative in Germany—in each case initiated by Plaintiffs—a phone call between Germany and New York is even less of a New York nexus than the face-to-face meeting in New York found to be insufficient in *Wyser-Pratte*. Thus, the burden on this Court is "not warranted given the slim nexus that this action has with New York." *Wyser-Pratte*, 2004 WL 3312835, at *5; *see also Fin. & Trading Ltd.* v. *Rhodia S.A.*, 28 A.D.3d 346, 346-47 (1st Dep't 2006).

## B.     Germany's Significant Interest in These Matters Dictates That Plaintiffs' Claims Should Be Adjudicated There.

In the Federal Action, Judge Baer took Germany's compelling interest into account, finding that "the strong connection of all aspects of this action to Germany provide additional support for [the] decision to decline to exercise supplemental jurisdiction over the state law claims asserted." *Elliott Assocs.*, 759 F. Supp. 2d at 477. This Court similarly should accord deference to Germany's undeniable interest in these cases.

"New York courts have recognized that where a foreign forum has a substantial interest in adjudicating an action, such interest is a factor weighing in favor of dismissal." *Shin-Etsu*, 9 A.D.3d at 178 (trial court erred by failing to defer to India's interest and recognizing that "Indian courts are keenly interested in governing the affairs of [India's] financial institutions to insure uniformity and consistency in the processing of financial transactions and in the interpretation of Indian banking statutes and laws."); *see also Imaging Holdings I, LP* v. *Isr. Aerospace Indus. Ltd.*, 26 Misc.3d 1226(A), 2009 WL 5895337, at *5 (Sup. Ct. New York Co.

Dec. 11, 2009) (granting forum non conveniens dismissal where "[i]t is indisputable that Israel has a strong interest in having this case adjudicated in its courts," and recognizing Israel's "strong stake in insuring that the affairs of [the Israeli company] are conducted with integrity and that its judicial system deals efficiently and fairly with complaints about [the company's] management"); *Globalvest*, 2005 WL 1148687, at *5 (dismissal based on Brazil's "paramount interest in resolving disputes" concerning a Brazilian company and noting the relevant investment was "already the subject of review by Brazilian regulators and Brazilian courts").

Germany has demonstrated clearly its interest in adjudicating Plaintiffs' claims. In its letter to the Court, the German Government has requested that, "[g]iven the close factual relationship with Germany," this Court dismiss Plaintiffs' claims "on the grounds of 'forum non conveniens.'" (Ex. 1.)  This letter affirms the German Government's "strong interest in the conduct of German businesses and trade in German securities being controlled by the German courts." (*Id*.)  The German Government Letter further explains that German law enforcement officials are "following up with the allegations against Porsche with all due vigor." (*Id.*)

Germany's interest in regulating its own capital markets is reflected in its establishment of robust statutory and regulatory regimes governing the conduct that Plaintiffs allege here.  Porsche is subject to German disclosure rules, as well as substantive rules governing trading.  (Mülbert Decl. ¶¶ 15, 18-20, 27-33.)  Germany's clear and strong interest in redressing any wrong regarding trading in securities listed on its stock exchanges is underscored by 2002 legislation introducing special liability for damages caused by misstatements in the capital markets.  (Wagner Decl. ¶ 31.)  This law was enacted "to strengthen the capital markets of Germany and to increase their competitiveness across Europe and the world," and to enhance "investor protection by increasing the transparency of securities markets and by creating the prerequisites for enforcing the prohibition of market manipulations and abuses of ad hoc

disclosures." (*Id.* ¶¶ 31-32.) This Court should defer to Germany's interest in "resolving its own

affairs." *Shin-Etsu*, 9 A.D.3d at 178; *see also* Restatement (Third) of Foreign Relations Law

§ 403(3) (1987) ("a state should defer to the other state if that state's interest is clearly greater").

### C.   Germany Is an Adequate Alternative Forum.

Although not a prerequisite, the availability of an adequate alternative forum,

such as Germany, is "an important consideration" for dismissal on forum non conveniens

grounds. *Wyser-Pratte*, 2004 WL 3312835, at *5 (finding Germany an adequate forum and

collecting cases); *Adriana Dev. Corp. N.V.* v. *Gaspar,* 81 A.D.2d 235, 240-43 (1st Dep't 1981)

(dismissing in favor of a German forum). German law provides a private cause of action on the

basis of allegations similar to those in the Complaints and full recovery of damages for

established financial losses. (Wagner Decl. ¶¶ 13, 15, 17.) Moreover, the system of fact-

gathering in Germany "provide[s] Plaintiffs with a full and fair opportunity to develop their

case." (*Id.* ¶ 5.)

Germany's adequacy is further highlighted by the fact that several investors have

already initiated, or taken steps to initiate, civil law-based proceedings in Germany against

Porsche, raising allegations similar to those in the Complaints. *See Globalvest*, 2005 WL

1148687, at *9 (finding Brazil adequate where defendant was "already litigating the subject

matter of this dispute" there); *Fin. & Trading Ltd.*, 28 A.D.3d at 347 (dismissing in favor of

France where litigation and investigations pending in France "will address the underlying facts,

including the alleged fraudulent disclosures"). Plaintiffs in these actions "could join the[]

proceedings [against Porsche in Germany] without further ado." (German Government Letter;

*cf.* Wagner Decl. ¶ 13.) Moreover, adjudicating Plaintiffs' claims in New York would run the

risk of inconsistent judgments and encourage forum shopping by potential plaintiffs. *See World*

*Point Trading*, 225 A.D.2d at 161 (dismissing in favor of Italian forum where parallel litigation

in New York presented the "risk that conflicting rulings might be issued by courts of two jurisdictions").

> ### D.    Resolution of Plaintiffs' Claims Requires Application of German Law.

"'The applicability of foreign law is an important consideration in determining a forum non conveniens motion,' and weighs against retention of the action." *Citigroup Global Mkts., Inc*. v. *Metals Holding Corp.*, 12 Misc.3d 1168A, 2006 WL 1594442, at *10 (Sup. Ct. New York Co. June 8, 2006) (quoting *Shin-Etsu*, 9 A.D.3d at 178).  "For this reason, New York courts commonly dismiss actions that may require interpretation of foreign law."  *Id*.; *see also Tilleke & Gibbins Int'l, Ltd.* v. *Baker & McKenzie*, 302 A.D.2d 328, 329 (1st Dep't 2003) (Thai law); *Neuter, Ltd.* v. *Citibank, N.A.*, 239 A.D.2d 213, 213 (1st Dep't 1997) (Swiss law).  Courts need not determine conclusively which sovereign's law applies to consider this factor.  *See, e.g.*, *Pahlavi*, 62 N.Y.2d at 480 (finding "the likely applicability of Iranian law" a relevant factor); *Phat Tan Nguyen* v. *Banque Indosuez*, 19 A.D.3d 292, 295 (1st Dep't 2005) (finding "either French or Vietnamese" law applicable).

Under New York's "interest analysis," which selects the "law of the jurisdiction which . . . has the greatest concern with the specific issue raised in the litigation," *Babcock* v. *Jackson*, 12 N.Y.2d 473, 481 (1963), it is clear that German law would govern in this case. When "conduct-regulating" rules such as fraud are at issue, the law of the jurisdiction where the alleged fraud occurred applies because "[t]he interest in regulating *behavior* taking place within a state's borders[] is not vindicated by applying the law of a jurisdiction in which the *behavior* being regulated *did not occur*."  *Chase Manhattan Bank* v. *N.H. Ins. Co.*, 193 Misc.2d 580, 583, 749 N.Y.S.2d 632, 634 (Sup. Ct. New York Co. May 23, 2002) (emphasis in original); *see also San Diego County Employees Ret. Ass'n.* v. *Maounis*, 749 F. Supp. 2d 104, 125 (S.D.N.Y. 2010) (holding that when the injury "has occurred in locations with only limited connection to the

conduct at issue, while a substantial portion of the fraudulent conduct has occurred in another locus . . . the plaintiffs' location is not a dispositive factor," and dismissing state law claims accordingly) (internal quotations omitted).  Because the alleged fraud occurred in Germany, Germany has the greatest interest in regulating German companies listed on the German stock market, and German law therefore applies to Plaintiffs' fraud claims.  *Fin. & Trading*, 28 A.D.3d at 347.  Judge Baer thus correctly found that German law applies to Plaintiffs' claims, stating that "the merits of Plaintiffs' common law fraud claims would require the Court to analyze German law governing securities fraud . . . ."  *Elliott Assocs.*, 759 F. Supp. 2d at 477.

**E.      This Court's Judgment Would Be Unenforceable in Germany.**

In determining whether to dismiss on forum non conveniens grounds, New York courts consider "the enforceability of a judgment if one is obtained."  *Hernandez*, 32 A.D.2d at 195 (quoting *Gulf Oil Corp.* v. *Gilbert*, 330 U.S. 501, 508 (1947)).  Dismissal is appropriate where there is a "possibility that [the court's] judgment may be ineffectual . . . ."  *Pahlavi*, 62 N.Y.2d at 482; *see also In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 276 (S.D.N.Y. 2010) ("Questions surrounding the enforceability of a judgment rendered by this Court also weigh in favor of dismissal.").

German law governing securities fraud cases provides for exclusive jurisdiction in German courts, rendering a U.S. judgment against Porsche unenforceable in Germany.  (Wagner Decl. ¶¶ 25-30.)  This law is intended "to prevent forum shopping" and "to prevent the 'regulatory function' of the German law of civil procedure from being pushed aside."  (*Id*. ¶ 35.) Judge Baer took this fact into account in dismissing the Federal Action, stating that "Germany provides for exclusive jurisdiction of securities fraud claims in its own courts, making any judgment from [a U.S. court] unenforceable in Germany."  *Elliott Assocs.*, 759 F. Supp. 2d at 477.  This Court should do the same.

**F.      The Relevant Witnesses and Documents Are Located in Germany.**

Dismissal of these actions is further warranted because many of the key witnesses live in Germany and are beyond the reach of New York's subpoena power.  For example, Porsche's former Chief Executive Officer, Dr. Wiedeking, and its former Chief Financial Officer, Mr. Haerter, whom Plaintiffs claim were the "masterminds" of the alleged scheme (GC ¶¶ 5, 24; VC ¶ 37), are German citizens who cannot be compelled to testify in a New York forum.  *See Elliott Assocs.*, 759 F. Supp. 2d at 472.  "The likely inability of [Defendant] to compel these critical witnesses to testify in New York . . . will unfairly prejudice [Defendant's] ability to defend against [Plaintiffs'] charges, strongly militating in favor of having this case heard [abroad]."  *Globalvest*, 2005 WL 1148687, at *7.  This Court's lack of jurisdiction over key witnesses thus weighs in favor of dismissal.  *See, e.g.*, *Nicholson* v. *Pfizer, Inc.*, 278 A.D.2d 143, 143 (1st Dep't 2000) (reversing denial of motion to dismiss where key witnesses were "beyond the reach of New York's subpoena power" and therefore "defendant [had] established its entitlement to dismissal of this action on the ground of forum non conveniens").

Dismissal is also appropriate because "most of the documents at issue here were drafted in Germany, are written in German and will require extensive translation."  *Wyser-Pratte*, 2004 WL 3312835, at *5; *Fin. & Trading*, 28 A.D.3d at 347 (dismissal appropriate where "the majority of the relevant documents and witnesses would be French").  Furthermore, documents located in Germany are subject to German and EU data privacy laws, which impose substantial restrictions on the transmission of routine business documents, such as emails, to the United States.  (Wagner Decl. ¶ 23-24.)  Balancing the inevitable conflicts between foreign data privacy laws with New York discovery rules will impose a significant burden on the parties, including motion practice to determine the scope of application of German data privacy laws to German documents.

G.     **Plaintiffs' New York Places of Business Are Not Dispositive.**

While certain, but not all, of the Plaintiffs claim New York as their principal place of business, as recognized by CPLR 327(a), "[t]he domicile or residence in this state of any party to the action shall not preclude the court from staying or dismissing the action" under the doctrine of forum non conveniens.  "[E]ven when a plaintiff . . . is a New York resident, New York courts will dismiss cases on forum non conveniens grounds where there is a limited connection between the other parties and the forum. . . ." *Citigroup*, 2006 WL 1594442, at *8.

Because a plaintiff's place of business is not dispositive, New York courts likewise routinely dismiss actions brought by New York corporations on forum non conveniens grounds where the case has a limited connection to New York.  *See, e.g., Wyser-Pratte*, 2004 WL 3312835, at *1; *Blueye Navigation, Inc.* v. *Den Norske Bank*, 239 A.D.2d 192, 192 (1st Dep't 1997) (affirming forum non conveniens dismissal "although one or more of the plaintiffs reside in New York").  Dismissal is even more appropriate here, because none of the Plaintiffs is organized under New York law, and 10 of the Plaintiffs are organized under the laws of the Cayman Islands and the British Virgin Islands for tax and other regulatory reasons.

In sum, because the balancing of all relevant factors demonstrates that Germany is the appropriate forum, the Court should dismiss Plaintiffs' Complaints.

II.     **AS A MATTER OF LAW, PLAINTIFFS' COMMON LAW FRAUD AND UNJUST ENRICHMENT CLAIMS DO NOT STATE A CAUSE OF ACTION.**

Plaintiffs' claims should be dismissed for the additional reason that they fail on the merits.  To determine the sufficiency of the complaint under CPLR 3211(a)(7), this Court must "determine if, assuming the truth of the facts alleged, the complaint states the elements of a legally cognizable cause of action." *1199 Hous. Corp.* v. *Int'l Fidelity Ins. Co.*, 14 A.D.3d 383, 384 (1st Dep't 2005) (citations omitted).  In so doing, however, the Court must not credit "bare

legal conclusions" or allegations that are "flatly contradicted by documentary evidence."
*Roberts* v. *Pollack*, 92 A.D.2d 440, 444 (1st Dep't 1983); *accord Herman* v. *Greenberg*, 221
A.D.2d 251, 251 (1st Dep't 1995). Even if the Court were to exercise jurisdiction and find that
New York law applies here, Plaintiffs have failed to satisfy these pleading requirements.

### A.   Porsche's Challenged Statements Were True at the Time They Were Made and Porsche Reasonably Believed Them To Be True at That Time.

Plaintiffs' allegations regarding the falsity of Porsche's statements are inadequate.
To state a cause of action for fraud, a plaintiff must allege "knowledge of the falsity of the
representation on the part of the person charged with the fraud . . . at the time the representation
was made." 60A N.Y. Jur. 2d Fraud and Deceit § 123. A belief in the truth of a representation
that turns out to be false "is a good defense to an action for fraud, at least where the belief was
reasonable." *Id.* § 124.

Given Porsche's actions and statements regarding its acquisition of VW Shares—
which depended in part on factors beyond its control—Porsche's statements are not actionable
both (i) because they were true at the time they were made, and (ii) because they "amount to no
more than statements of prediction or expectation" and therefore cannot be considered a
guarantee that Porsche would never seek to acquire a dominant stake in VW Shares.
*Naturopathic Labs. Int'l, Inc.* v. *SSL Americas, Inc.*, 18 A.D.3d 404, 404 (1st Dep't 2005) (*aff'g*
2004 WL 5487975 (Sup. Ct. New York Co. Mar. 8, 2004) (Ramos, J.)); *see also ESBE Holdings,
Inc.* v. *Vanquish Acquisition Partners, LLC*, 50 A.D.3d 397, 398 (1st Dep't 2008).

Plaintiffs allege that by announcing that Porsche intended to increase its share of
VW Shares "to over 50%," Porsche was telling "a reasonable investor" it intended to go to
"slightly more than [] 50%" and no higher. (GC ¶¶ 96-97, 100, 103; VC ¶¶ 26(a), 26(c), 48(b),

48(g), 48(i).)[6]  Plaintiffs also allege that several statements by Porsche to the effect that a 75%

stake and domination agreement were "totally unrealistic," "purely theoretical," and "out of the

question at present" precluded such a course, notwithstanding subsequent changes in

circumstances.  (GC ¶¶ 105, 109, 113; *see also* VC ¶ 48(k)-(m).)  Moreover, Plaintiffs allege that

Porsche denied to several hedge fund groups that it intended to go to 75%.  (GC ¶¶ 93, 116, 120,

123; VC ¶¶ 28, 31(a)-(d), 48(f), 48(n)-(p).)  As a matter of law, in light of all the publicly

available information, any reasonable investor, particularly investors as sophisticated as

Plaintiffs, surely recognized that Porsche could not and did not guarantee that it would never

acquire 75% either in the near term or at all.

      *First*, Porsche continually and publicly increased its goals with respect to its

ownership of VW:  initially seeking only 20% of VW Shares, but later revising that goal and

publicly announcing, in March 2007, its decision to increase its stake to 31%, and, in March

2008, its decision to increase its "stake in VW to more than 50%."  (Ex. 7; VC ¶ 26(a); GC

¶¶ 74, 83.)  *Second*, Porsche publicly made clear in early 2008 that it sought to nullify the VW

Act, the effect of which would be to permit Porsche to enter into a domination and profit transfer

agreement with a 75% stake in VW.  (Exs. 33, 34.)

      *Third*, Porsche publicly cautioned that its goals with respect to VW could change.

Market analysts concluded as early as 2007 that Porsche had not ruled out a 75% stake.  One

stated that "Porsche is striving for 50% of VW for now, but fundamentally wants to acquire a

majority of more than 75%."  (Ex. 35.)  Another stated that "we wouldn't be surprised if Porsche

eventually announced it owns 70% or more" (Ex. 36 at 5; GC ¶¶ 15(b), 116; VC ¶ 31(b)), and a

---

[6]     Of the 16 alleged misstatements, 10 refer to underlying documents, which correspond to the following exhibits: VC ¶ 48(b) (Ex. 15 at 2); GC ¶ 89 &VC ¶ 48(c) (Ex. 18); GC ¶ 96 & VC ¶ 48(g) (Ex. 26); GC. ¶ 99 & VC ¶ 48(i) (Ex. 17 at 2); GC ¶ 105 & VC ¶ 48(k) (Ex. 27); GC ¶ 109 & VC ¶ 48(l) (Ex. 28); GC ¶ 113 & VC ¶ 48(m) (Ex. 29 at 4); VC ¶ 48(a) (Ex. 30);VC ¶ 48(e) (Ex. 31); VC ¶ 48(h) (Ex. 32).

third focused on Porsche's use of "words like 'currently not, not at the moment or not at present'" in reaching the same conclusion as to Porsche's "ultimate goal."  (Ex. 37 at 1, 4.)

While forsaking any intention of going to 75% and calling such a goal "unrealistic" prior to its October 26, 2008 announcement (*see, e.g.*, GC ¶ 105), Porsche continued to put investors on notice throughout 2008 that it might seek to do so in the future by stating that Porsche did "not want to rule out th[e] possibility" of going to 75% "at the end of the day, some point in the future" or "obstruct our path for this."  (GC ¶ 109; VC ¶ 48(l); Exs. 38, 29 at 4, 28.)

*Finally*, Porsche's October 26, 2008 announcement made clear that (i) its 2008 objective for VW Shares remained, as it had been, "above 50 percent,"[7] (ii) it had not yet reached that goal but would do so over the next two months, and (iii) cash-settled options were not equivalent to physical shares, but to be settled in cash.  (Ex. 14.)  Indeed, were they equivalent, Porsche would not only have achieved "above 50%" in October 2008 or earlier, rather than intending to do so "in November/December 2008," but would have been within a hair's breadth of 75%.  Porsche, however, made clear that it was not there.  Porsche decided to aim to increase its VW stake "to 75% in 2009" if "the economic framework conditions are suitable."

The timing of this announcement that Porsche *might* seek a 75% stake *the next year* was hardly surprising.  On October 24, 2008, Porsche announced that its owning families, including Prof. Piëch, were united in supporting its control of VW and, on October 25, 2008, it was reported that the German Government was unlikely to resist an EC action to strike the 80% provision from the VW Act.  (Exs. 14, 21, 39.)  In light of the public record, Plaintiffs' theory that Porsche orchestrated "a massive short squeeze" by secretly acquiring "control over virtually

---

[7]      Although the *Viking* Plaintiffs rely on an April 17, 2008 article in support of its argument that Porsche publicly announced that it intended to increase its stake in VW "to *only* 50%"  (VC ¶¶ 26(d), 48(e)), this article in fact states that Porsche's Board had authorized management to increase Porsche's stake in VW "to *more than* 50%." (Ex. 31) (emphasis added).

the entire free float of VW shares by entering into derivatives contracts" (GC ¶¶ 1, 5, 17, 24; VC ¶¶ 37, 65, 67) is implausible.

The facts of public record clearly demonstrate that circumstances changed just prior to the October 26, 2008 announcement, when Porsche's decision to aim to go to 75% if economic conditions permitted—an aim never realized—moved the option to go to 75% from a "theoretical possibility" to a determined and resolved business goal. *See Elliott Assocs., L.P.* v. *Covance, Inc.*, No. 00-cv-4115, 2000 WL 1752848, at *7 (S.D.N.Y. Nov. 28, 2000) ("The mere disclosure of adverse information shortly after a positive statement does not support a finding that the prior statement was false at the time it was made."). As reflected in the public record, Porsche's acquisition strategy *could* have changed at any time and Plaintiffs thus have not sufficiently pled, as they must for the challenged statements to be actionable, that the "speakers were aware of contrary information at the time they expressed their opinions regarding the status of the" attempted takeover of VW. *Id.* at *9.

**B.** **The Two Sources Cited To Support Plaintiffs' Misstatement Claims Do Not Suffice for That Purpose, and the Attack on Porsche's Options Disclosure Fails As Well.**

According to Plaintiffs, contrary to its October 26, 2008 announcement and its earlier statements, Porsche actually sought a 75% stake in February 2008. In support of this claim, Plaintiffs rely on two articles from the German press (*see, e.g.*, GC ¶¶ 8, 11; VC ¶¶ 43, 50) whose allegations lack adequate support. A complaint "must identify sufficiently the sources upon which [plaintiffs'] beliefs are based and those sources must have been likely to have known the relevant facts." *In re Optionable Sec. Litig.*, 577 F. Supp. 2d 681, 689 (S.D.N.Y. 2008) (internal quotation omitted). Plaintiffs have not satisfied this requirement.

*First*, Plaintiffs allege that during a "secret meeting in Berlin on February 25, 2008," with an unnamed official of the State of Lower Saxony, Porsche "stated its intention to

implement a domination and profit transfer agreement . . . ."  (GC ¶¶ 90, 94, 97, 100, 103, 117, 121, 131(a); VC ¶ 43.)  The sole basis for this allegation is a German magazine article published 15 months later in May 2009 that refers to an unnamed "participant in the meeting in Berlin," who claims that unnamed "Porsche representatives coughed up the fact that Porsche was striving for a domination and profit transfer agreement."[8]

As a matter of law, unidentified sources cannot support allegations of fraud unless they are "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak* v. *Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000).  Neither the article upon which Plaintiffs rely nor the Complaints identify the article's supposed source, much less contain sufficient facts to show that the also unnamed "high-level Porsche representatives" were "likely to have known the relevant facts" about Porsche's investment plans in VW.  *Optionable*, 577 F. Supp. 2d at 689; *see also In re MSC Indus. Direct Co. Sec. Litig.*, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003) ("former employee with high-level corporate duties" was insufficiently described).

*Second*, Plaintiffs rely on a May 2009 article to claim that Prof. Piëch admitted that Porsche's decision to go to 75% had been made several months prior to its October 26, 2008 announcement.  (GC ¶¶ 11, 106, 131(c); VC ¶ 50.)  The article stated:

> Porsche's decision to increase its holding in Volkswagen to 75 percent was made at the end of the first half of 2008.  "Everything was still OK then," says Piëch.  No financial crisis in sight, and Porsche CFO Holger Härter obviously had a handle on the latest credit lines for ten billion Euros.  "In October, the interest rate increased to almost double," says Piëch.  "From that time on, it could

---

[8]     Although Plaintiffs do not identify the article, they apparently rely on an article that appeared in the online version of *WirtschaftsWoche*, a German weekly magazine, on May 8, 2009.  (Ex. 40.)  The Complaints fail to mention that a Lower Saxony representative responded in writing to this magazine to clarify that Porsche did not "expressly or impliedly declare[] in this meeting that Porsche intends to enter into a domination agreement with Volkswagen."  (Ex. 41.)

> be expected that things would get tighter on the markets."  But the
> Porsche management did not find any answer for this.[9]

This isolated paragraph is an insufficient basis to state a cause of action for fraud.  Indeed, other than the reporter's having done so, there is no basis to link the "Everything was still OK then" quote to the time of Porsche's decision to acquire a 75% stake.

Allegations derived from indirect quotes cannot give rise to a strong inference of fraudulent conduct.  *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 271 (2d Cir. 1993) (newspaper report insufficient to "give rise to a strong inference that Time Warner began to consider the rights offering significantly before it was announced."); *Ferber* v. *Travelers Corp.*, 785 F. Supp. 1101, 1108 (D. Conn. 1991) ("indirect quotes" insufficient to support a strong inference of fraud).  Accordingly, Plaintiffs' attempt to rely on unattributed and indirect quotes to show that Porsche had decided to acquire a 75% stake in VW in early- or mid-2008 fails.[10]

*Finally*, Plaintiffs allege in conclusory fashion that Porsche secretly surpassed its announced goals for VW Share ownership by using cash-settled options, and that "Porsche did not really consider its options contracts to be cash settled."  (GC ¶ 12, VC ¶ 54.)  Porsche, however, repeatedly disclosed its use of such options (Exs. 15 at 3, 16 at 167, 17 at 2), and its October 26, 2008 announcement made clear that cash-settled options were not functionally equivalent to share ownership.  (Ex. 14.)  Although Plaintiffs allege that Porsche attempted to "minimize[] the cash settled nature of the contracts by calling them the 'so called' cash-settled

---

[9]     Plaintiffs do not cite to a specific article for this quotation.  It appears to have originated from *Demonstration of Power in Sardinia*, Welt Online, May 13, 2009.  (Ex. 42.)  Based on Porsche's review of other German articles, none attributes to Prof. Piëch any statements regarding Porsche's alleged decision to go to 75% prior to the October 26, 2008 announcement.

[10]    Similarly, the allegation that "Porsche told analysts at the Frankfurt Auto Show in September 2007 that it could take delivery in physical stock when it exercised these types of options" (*see, e.g.*, GC ¶ 107) fails to state with particularity that the unnamed "Porsche" representative possessed the information alleged, so it is insufficient as a matter of law.  *Novak*, 216 F.3d at 314.

options" (GC ¶ 12; *see also* VC ¶ 54), this is nothing other than a flag for the use of specialized

terminology, *i.e.*, jargon.[11]

### C.    Plaintiffs' Unjust Enrichment Claims Fail To State a Cause of Action.

An unjust enrichment claim requires a showing that (i) the defendant was

enriched, (ii) at the plaintiff's expense, and (iii) it would be inequitable to permit the defendant to

retain that which is claimed by the plaintiff. *See Mandarin*, 16 N.Y.3d at 182. "The theory of

unjust enrichment lies as a quasi-contract claim.   It is an obligation imposed by equity to prevent

injustice, in the absence of an actual agreement between the parties concerned." *IDT Corp.* v.

*Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142 (2009) (citation omitted).   Because

Plaintiffs fail to plead facts adequate to establish that Porsche was enriched at Plaintiffs'

expense, they fail to state a cause of action for unjust enrichment.

The essence of an unjust enrichment claim is that one party parted with money or

a benefit that was received by another at the expense of the first party.   *See Edelman* v. *Starwood*

*Capital Group, LLC*, 70 A.D.3d 246, 250 (1st Dep't 2009).   The benefit obtained must be both

specific and flow directly from the plaintiff; an attenuated connection between the defendant's

enrichment and the plaintiff's loss is insufficient.   *See Sperry* v. *Crompton Corp.*, 8 N.Y.3d 204,

---

[11]       Moreover, Plaintiffs' allegation that Porsche fraudulently "failed to disclose its intentions and the true facts of its stake in VW" (GC ¶ 139; VC ¶ 80) fails.   An omission is actionable only in the context of a duty to disclose. *See Triple Z Postal Servs., Inc.* v. *United Parcel Serv., Inc.*, 13 Misc. 3d 1241A, 2006 WL 3393259, at *14 (Sup. Ct. New York Co. Nov. 24, 2006) ("Where [a fraud claim] is based on material omissions, the general rule is that no duty to disclose exists in the absence of a confidential fiduciary relationship or statutory duty between two parties to a contract.").   Superior knowledge alone does not trigger such a duty; a duty to disclose arises *only* "in the context of a business transaction." *TVT Records* v. *Island Def Jam Music Group,* 412 F.3d 82, 90-91 (2d Cir. 2005); *see also OSRecovery, Inc.* v. *One Groupe Int'l, Inc.*, 354 F. Supp. 2d 357, 377 (S.D.N.Y. 2005).   The relevant transactions—Plaintiffs' short sales and swap agreements—were entered into with unnamed counterparties, not Porsche.   Because there was no business transaction between Plaintiffs and Porsche, no duty to disclose was triggered.   Furthermore, neither Complaint even alleges that Porsche knew specifically that Plaintiffs were entering into short sale transactions on the basis of allegedly mistaken knowledge. *Viking* Plaintiffs merely allege that their representative told Porsche it was "doing some research on Porsche and would love to . . . learn[] about [the] company." (VC ¶ 27.) *Glenhill* Plaintiffs do not even allege that much.   (GC ¶¶ 93, 102, 110, 120, 123.) *See Mandarin Trading Ltd.* v. *Wildenstein*, 17 Misc.3d 1118A, 2007 WL 3101235, at *5 (Sup. Ct. New York Co. Sept. 4, 2007) (dismissing complaint for failure to adequately allege that "[d]efendants knew that an appraisal coming from them would be relied upon" by plaintiffs), *aff'd*, 65 A.D.3d 448 (1st Dep't 2009), *aff'd*, 16 N.Y.3d 173 (2011).

216 (2007) (dismissing unjust enrichment claim where "the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process is simply too attenuated to support such a claim."); *Bangkok Crafts Corp.* v. *Capitolo Di San Pietro in Vaticano*, 331 F. Supp. 2d 247, 256 (S.D.N.Y. 2004) (where there was no allegation that defendants received the payments at issue "in their own right and for their direct benefit[,] . . . [s]uch an attenuated chain of payment cannot support a claim for unjust enrichment.").

Here, the Complaints do not allege that Porsche received *any* direct benefit from Plaintiffs.  There is no allegation that Porsche traded with, or received compensation directly from, any Plaintiff.  Although Plaintiffs allege that they sold VW Shares short (and in some instances, engaged in short-equivalent swap agreements), they do not allege that they borrowed any shares from Porsche directly or later purchased shares from Porsche in order to cover their short positions.  Nor do Plaintiffs allege that they were the counterparties to Porsche's cash-settled options transactions.  Thus, any theoretical benefit that Porsche may have obtained from Plaintiffs' alleged transactions could have accrued only in a highly attenuated fashion, and therefore could not provide the basis for a claim for unjust enrichment.[12]

III.   **IN THE ALTERNATIVE, THIS COURT SHOULD DISMISS OR STAY THE COMPLAINTS IN LIGHT OF THE PENDING FEDERAL ACTION THAT INVOLVES SUBSTANTIALLY THE SAME PARTIES, CLAIMS, AND RELIEF SOUGHT.**

New York's "general rule" is "that 'the court which has first taken jurisdiction is the one in which the matter should be determined and it is a violation of the rules of comity to interfere.'"  *In re Topps Co., S'holder Litig.*, 19 Misc.3d 1103A, 2007 WL 5018882, at *3 (Sup.

---

[12]     *See Wachovia*, 14 Misc.3d 1228A, 2007 WL 419366, at *4 (rejecting plaintiff's argument "that all that is required to maintain an action for unjust enrichment is that the defendant received benefits to which it was not entitled that were effectively conferred by plaintiff in the form of a lower price for its shares"), *aff'd*, 56 A.D.3d 269 (1st Dep't 2008); *CompuDyne Corp.* v. *Shane*, 453 F. Supp. 2d 807, 833 (S.D.N.Y. 2006) (where plaintiffs were not "a counter-party in connection with any of the trades" and "any proceeds . . . came from the counterparties to those transactions," court held that defendant "could not have been enriched by these trades at Plaintiffs' expense").

Ct. New York Co. June 8, 2007) (quoting *White Light*, 231 A.D.2d at 96).  CPLR 3211(a)(4)

authorizes a court to dismiss or stay an action when there is another action pending between

substantially similar parties for the same cause of action in another court.  This rule gives courts

discretion, which should be exercised "to avoid vexatious litigation and duplication of effort,

with the attendant risk of divergent rulings on similar issues."  *White Light*, 231 A.D.2d at 96.

      As New York courts have recognized, "commencing multiple lawsuits emanating

from the same underlying event will not be condoned."  *Colon* v. *Gold*, 166 A.D.2d 406, 407 (2d

Dep't 1990).  "[T]he progression of two actions of such common identity against the same

defendant in separate forums, is indefensible[,] . . . would place an undue burden on [the

defendant] and constitute a waste of judicial energies."  *Krisel* v. *Phillips Petroleum Co*., 32

A.D.2d 628, 629 (1st Dep't 1969).  In light of the pending Federal Action, alternatively, this

Court should exercise its discretion under CPLR 3211(a)(4) and dismiss or stay the Complaints.

      To satisfy CPLR 3211(a)(4), a defendant needs to demonstrate that (i) there is "a

substantial identity of the parties and causes of action," (ii) "the two actions are sufficiently

similar," and (iii) "the relief sought is the same or substantially the same."  *Cherico, Cherico &*

*Assocs.* v. *Midollo*, 67 A.D.3d 622, 622 (2d Dep't 2009) (internal quotations omitted).  "The

critical element is that both suits arise out of the same subject matter or series of alleged

wrongs."  *Id.* (internal quotation marks omitted).  All these conditions are easily satisfied here.

      *First*, all Plaintiffs in this action previously filed complaints in the Federal Action

against Porsche, including claims of common law fraud.  The *Viking* Plaintiffs also alleged a

claim of unjust enrichment.[13]  Judge Baer's decision dismissing the federal complaints is

currently on appeal to the Second Circuit.   The identities of the parties in the pending federal

---

[13]    The complaints filed by the *Glenhill* Plaintiffs and the *Viking* Plaintiffs in those respective federal actions
are attached as Exhibits 43 and 44 to the Giuffra Aff.

and state cases are substantially the same.  Porsche is the defendant in both actions, and 12

Plaintiffs from this action are appellants in the Federal Action.  "[C]omplete identity of parties is

not necessary . . . as it is sufficient that 'at least one plaintiff and one defendant is common in

each action.'"  *Certain Underwriters at Lloyd's* v. *Pneumo Abex Corp.*, No. 602493/2002, 2005

WL 5960116 (Sup. Ct. New York Co. July 29, 2005) (citations omitted); *see also Proietto* v.

*Donohue*, 189 A.D.2d 807, 807-08 (2d Dep't 1993) (same).

       *Second*, the federal and state actions arise out of the "same subject matter or series

of alleged wrongs," namely, Porsche's alleged misrepresentations regarding its acquisition of a

stake in VW.  (*Compare* GC ¶¶ 1, 9 *with* Ex. 43 at ¶¶ 2, 6; *compare* VC ¶¶ 37, 60 *with* Ex. 44 at

¶ 1.)  Indeed, both the state and federal complaints raise substantially similar allegations

(sometimes in identical language).  (*Compare* GC ¶ 5 ("Porsche lured Plaintiffs into a trap,

making Plaintiffs believe VW shares were overvalued while hiding from Plaintiffs the risk of a

massive short squeeze that would send the price skyrocketing several hundred percent"), *with*

Ex. 43 at ¶ 2 ("Porsche lured Plaintiffs into a trap, making Plaintiffs believe VW shares were

overvalued while hiding from Plaintiffs the risk of a massive short squeeze that soon would send

the price of VW shares skyrocketing several hundred percent").[14]

       Moreover, the state and federal complaints allege the same misrepresentations by

Porsche.  (*Compare* GC ¶¶ 88-125 *with* Ex. 43 at ¶¶ 114-138; *compare* VC ¶ 48 *with* Ex. 44 at

¶ 44.)  And all four complaints rely on the same allegation to support their claim that Porsche's

statements were intentionally false.  Specifically, they all allege, based on the same single news

article, that at a "secret meeting" in February 2008, Porsche disclosed to a high-ranking German

---

[14]     *Compare* VC ¶¶ 33-34 *with* Ex. 44 at ¶ 28; *compare* GC ¶¶ 3-6 *with* Ex. 43 at ¶¶ 2-3; *compare* VC ¶ 71 *with* Ex. 44 at ¶ 5; *compare* GC ¶ 20 *with* Ex. 43 at ¶ 117; *compare* VC ¶¶ 51-55 *with* Ex. 44 at. ¶¶ 47-51; *compare* GC ¶¶ 10-13 *with* Ex. 43 at ¶¶ 7-12.

official its intent to acquire 75% of VW Shares.  (*Compare* GC ¶ 90 *with* Ex. 43 at ¶ 115;

*compare* VC ¶ 43 *with* Ex. 44 at ¶ 40.)

   *Third*, the claims and the relief that Plaintiffs seek in their state and federal

complaints are "the same or substantially the same."  Plaintiffs seek to recover monetary

damages incurred, and profits lost, from covering short positions in VW Shares at artificially

high prices.  (*Compare* GC ¶¶ 31, 92, and Prayer for Relief, *with* Ex. 43 at ¶¶ 3, 32 and Prayer

for Relief; *compare* VC ¶ 72 and Prayer for Relief, *with* Ex. 44 at ¶ 68 and Prayer for Relief.)

Moreover, although Plaintiffs in the state actions do not allege claims based on the Exchange

Act, the federal complaints allege the same state law causes of actions, entitling Plaintiffs to the

same relief in federal court as they would be entitled to in these actions if they were to prevail.

   Presented with substantially similar facts as here, in *Burrowes* v. *Combs*, No.

104225/2011, 2005 WL 5643840 (Sup. Ct. New York Co. Feb. 18, 2005) (Ramos, J.), this Court

stayed the state action pending resolution of the appeal of the first-filed federal case pursuant to

CPLR 2201, which applies the same standard as CPLR 3211(a)(4).[15]  As in *Burrowes*, in these

actions, "the state law claims in the federal action are either identical to, or substantively the

same as, the claims here," and "[a]ll claims are based on the same allegations of fact."  *Id.* at 3.

Although *Burrowes* involved identical parties in the state and federal actions, this Court made

clear that "a stay may be warranted when instead of complete identity, there exists substantial

identity between two actions."  *Id.* at 2 (citation omitted).  There can be no dispute that

"substantial identity" exists here.

---

[15] *See Asher* v. *Abbott Labs.*, 307 A.D.2d 211, 211 (1st Dept. 2003) (a stay pursuant to CPLR 2201 is
warranted "when there is substantial identity between state and federal actions" and where due consideration is
given to "issues of comity, orderly procedure and judicial economy"); 1 N.Y. Jur. 2d Actions § 29 ("A stay may be
granted because of the pendency of another action or proceeding on the same cause of action and for the same relief
. . . .  Authority for such a stay is to be found not only in the general provision of the CPLR relating to stays [2201]
but also in the CPLR provision on motions to dismiss [CPLR 3211(a)(4)]").

In sum, simultaneous litigation of the first-filed—and still pending—Federal Action and the New York actions presents the risk that conflicting rulings might be issued by different courts and that efforts will be duplicated in litigating substantially identical cases in different forums.  In the interests of comity and preservation of judicial resources, the Court should dismiss or stay these actions.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaints under the doctrine of forum non conveniens or for failure to state a cause of action.  In the alternative, the Court should dismiss the Complaints or stay the actions pursuant to CPLR 3211(a)(4).

Respectfully submitted,

Robert J. Giuffra, Jr.
John L. Warden
Suhana S. Han
Alexander J. Willscher
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY  10004
Tel:  (212) 558-4000
Fax:  (212) 558-3588

*Counsel for Porsche Automobil Holding SE*

June 29, 2011